## CITY OF ST. LOUIS v. J. E. KAIME & BROTHER REAL ESTATE COMPANY, Appellant.

**Division Two, March 1, 1904.**

1. **POWERS: General and Special Clauses in Charter: Nuisance: Agents.** Where there is a specific clause in a charter giving to the mayor and assembly power "to take down and remove buildings that are or may become dangerous, or require owners to remove or put them in a safe or secure condition," an ordinance expressing the same thing must be referred to that clause for its authority, and not to another clause which gives the mayor and assembly power "to license and regulate real estate agents." Hence, if the express grant does not give the city authority to punish the agents of the owner of the building for neglect to remove it, power to do that can not be found in the general clause in reference to real estate agents.

2. ———: **Exercise: Under General Grant: Limitation.** The exercise of a power under a general grant can not be extended beyond the limitations contained in an express grant.

3. ———: **Removal of Dangerous Buildings: Punishment of Agent.** The city of St. Louis has no power under its charter to pass an ordinance authorizing the punishment by fine of a real estate agent who fails to take down and remove dangerous buildings or make them secure after notice. Under the charter only owners of the buildings can be punished for such failure. The term "owner" used in the charter can not be extended to include an agent of the owner, for that is not a reasonably necessary incident of the power granted.

**Appeal from St. Louis Court of Criminal Correction.—**
*Hon. Willis H. Clark,* Judge.

REVERSED.

*Clinton Rowell* and *Joseph H. Zumbalen* for appellant.

(1) The ordinance is void in so far as it imposes upon the agent of the owner the duty of removing or securing unsafe buildings.   (a) Because the assembly has no power to impose such duty on the agent.   St.

Louis v. Weber, 44 Mo. 550; St. Charles v. Nolle, 51 Mo. 122; City of Tarkio v. Cook, 120 Mo. 9; City v. Eddy, 123 Mo. 557; Mt. Pleasant v. Beckwith, 100 U. S. 514; 1 Dillon, Mun. Corp. (4 Ed.), sec. 89; St. Louis v. Bell Tel. Co., 96 Mo. 623; Independence v. Cleveland, 167 Mo. 384; St. Louis Charter, art. 3, sec. 26, subdivisions 6, 12 and 14; Ruschenberg v. Railroad, 161 Mo. 70; 21 Am. and Eng. Ency. Law (2 Ed.), p. 949.    (b) Because it is unreasonable, oppressive, inconsistent with the law of the State, and repugnant to fundamental rights. Steinhauser v. Spraul, 127 Mo. 542; Schmidt v. Rowse, 35 Mo. App. 288; Charter, art 12, sec. 6; 21 Am. and Eng. Ency. Law (2 Ed.), p. 985; 1 Smith's Public Corporation, sec. 95.    (2)    If valid, the term "agent," as used in the ordinance, must be construed to apply only to an agent who has authority from the owner sufficiently broad to justify his securing or removing the building.    Parker & Worthington, Public Health and Safety, p. 229.

*Chas. W. Bates* and *B. H. Charles* for respondent.

(1)    All charter provisions *in pari materia* must be upheld.    Hill v. St. Louis, 159 Mo. 166.    (2)    The charter power to regulate real estate agents means the power to prescribe the rules upon which they may conduct their business.    Hill v. St. Louis, 159 Mo. 171; St. Louis v. Fischer, 167 Mo. 662; Gibbons v. Ogden, 9 Wheat. 196.    And the regulation of real estate agents very properly extends to preventing them from handling any property that is dangerous or a menace to the public.    (3)    And the city being given the power, by paragraphs 5 and 14, to enact section 250 of the Code, this power is not taken away by other provisions of the same instrument which provide for certain special means of obtaining the same result, especially in the absence of any express terms by which such special means might have been made exclusive and prohibitory.    State ex rel. v. Walbridge, 119 Mo. 383; Bank v. Sarles, 129

Ind. 201.   (4)   So far as the regulation of real estate agents is concerned, the only provisions of the charter relative thereto are said paragraphs 5 and 14 of sec. 26, art. 3.   (5)   If appellant can not be punished in this proceeding, then there is no way to reach the non-resident owner whose building is a violation of the law (Eichenlaub v. St. Joseph, 113 Mo. 404), and a menace to the public.   The owner would enjoy absolute immunity. He could go on continually, maintaining a nuisance, and violating the law of the city.   It will not do to say the public may itself abate the nuisance.   True enough.   It may do this for its own protection, but that would not render the owner any less a lawbreaker, nor would his agent, who is continually drawing a profit out of that lawbreaking, be any the less an accessory thereto. (6) The ordinance is not unreasonable nor oppressive as applied to real estate agents who rent or lease dangerous buildings and collect rents therefor.   No ordinance will be declared invalid on the ground that it is oppressive or unreasonable unless he who attacks it shows it to be such by the clearest proof. (a) It is a legitimate regulation of real estate agents, and merely imposes upon them the burden which rests upon all in the community, to so conduct their business as not to assist in the violation of the law, which, in the interest of public safety, requires dangerous buildings to be secured or torn down.   (b)   As applied to the agent with authority to rent, lease or collect rents, it is the legitimate enforcement of proper penal laws for the protection of the public aginst dangerous buildings.   State v. Stone, 118 Mo. 403; Paul v. Virginia, 8 Wall. 168; State v. Buck, 120 Mo. 479.

FOX, J.—"This is an action by the city of St. Louis to recover a fine for an alleged violation of an ordinance of said city, commenced in the first district police court, where, upon trial had, the defendant was found guilty and fined $100. From the judgment de-

fendant, on the day of its rendition, took an appeal to the St. Louis Court of Criminal Correction. Upon trial anew in said Court of Criminal Correction, defendant was, on October 2, 1902, again found guilty of the charge made against it, and fined $250. After unsuccessful motions for a new trial and in arrest of judgment, defendant was allowed an appeal to this court.

''The information or complaint alleged that the defendant was indebted to the plaintiff in the sum of $500, for the violation of section 250 of the general ordinance of said city, 'in this, to-wit: in the city of St. Louis, and State of Missouri, on the 1st day of August, 1902, and, on divers other days and times prior thereto, the said J. E. Kaime & Bro. Real Estate Company (a corporation) did then and there *as agents therefor,* fail to secure or remove the dangerous buildings located at No. 613, 615, 617, 619, 621 and 623 Market Street in City Block No. 131 of said city within three days after having been notified on the 9th day of July, 1902, by the mayor of St. Louis so to do.'

''The ordinance relied upon in said complaint is as follows:

'' 'Whenever the mayor shall be informed that any building or other structure is in a condition or situation to endanger the lives of persons passing or residing in the vicinity thereof, or to endanger property, he shall immediately notify the commissioner of public buildings, who shall forthwith proceed to make a survey or examination of said building or structure, and report to him his opinion of the same. If from said report or any other reliable information the mayor shall believe that said building or other structure is in a condition or situation to endanger the lives of persons or injure property, he shall notify the owner or agent of such building or other structure to have the same removed or otherwise properly secured within three days thereafter, and should such owner or agent fail to comply with said notice, it shall be the duty of

the commissioner of public buildings to proceed forth-
with to have the same. demolished, or so much thereof
as may be necessary. And if any such owner or agent
shall fail to comply with the requirements of such notice
he or they shall be deemed guilty of a misdemeanor,
and upon conviction thereof shall be fined not less than
twenty-five nor more than five hundred dollars. The
cost of demolishing such building or other structure
shall be paid in the first place by the city out of the con-
tingent fund. The comptroller, upon a certificate from
the commissioner of public buildings, approved by the
mayor, shall then make out bills for said work against
the owner or owners of said building or other structure.
In case said bills are not paid upon presentation, with
the consent of the mayor, they shall be placed in the
hands of the city attorney or any other officer of the
law department, who shall sue for the same as in the
case with other debts due the city, and the amount, when
paid, shall be credited to the contingent fund.'

''Plaintiff's evidence tended to show that the build-
ings in question had been examined in July, 1902, and
on October 1, 1902, by the chief and assistant inspector
of the building commissioner's office; that they were
in an unsafe and dangerous condition; that the walls
are out of plumb, the floors sunk, the joists decayed
where they enter the walls; that one is a two-story
frame, one a three-story brick, and the others two-story
brick buildings, with stores on the first floor and rooms
above; that all are very old and dilapidated, and are
occupied by tenants; that the defendant is the agent of
said buildings for the Burnes estate; that the building
commissioner reported the dangerous condition of the
buildings to the mayor of the city of St. Louis, and that
that latter on July —, 1902, caused a written notice to be
served on the defendant requiring it to have the build-
ings removed or properly secured within three days.

''On behalf of the defendant there was evidence of
three experienced builders tending to show that neither

of said buildings, nor any part thereof, was in an unsafe or dangerous condition.

"It appeared that the buildings are owned by the Burnes estate, a Missouri corporation, having its office at St. Joseph, Missouri, and that the defendant is the agent of the Burnes estate for renting said buildings and collecting the rents; that defendant has authority from the owner to make temporary repairs, such as whitening and papering, but none to make permanent and substantial repairs on said buildings, or to demolish or remove them; that defendant notified the Burnes estate in July, 1902, that the buildings had been condemned by the city, but had not received any authority from the owner to remove or secure them."

At the close of the evidence, defendant moved for its discharge, which motion was by the court overruled. The cause was submitted to the court, which resulted in the finding of the defendant guilty and the punishment assessed as heretofore stated.

Motions on the part of defendant for new trial and in arrest of judgment were by the court overruled, and this cause is now before us, on appeal, for review.

The record before us upon this appeal presents two legal propositions for our solution. First: The power of the Municipal Assembly of the city of St. Louis to enact the ordinance upon which this proceeding is predicated. Second: If the power is granted by the charter to enact such ordinance, is the enactment so unreasonable and oppressive as to authorize the court to declare it void and non-enforcible.

The solution of these two propositions must rest upon the fair and reasonable interpretation of the charter provisions, from which the power must emanate to enact the ordinance involved in this controversy. The charter of the city of St. Louis is the source of all power sought to be exercised by the Municipal Assembly, and the doctrine is so well settled and recognized that it can only exercise such powers as are expressly

granted or reasonably incident to such as are granted, that it is needless to burden this opinion with the citation of authorities.

Respondent bases the power and authority of the Municipal Assembly to enact section 250, which is the ordinance charged to have been violated, upon the following provisions of the charter:

"The mayor and assembly shall have power within the city, by ordinance not inconsistent with the Constitution or any law of this State, or of this charter . . .

"Fifth.  To license and regulate . . . agents . . . real estate agents. . . .

"Sixth. . . . To declare, prevent and abate nuisances on public or private property and the causes thereof; and the mayor, whenever, in his opinion, a nuisance exists on public or private property, . . . is authorized to abate and remove such nuisance and the cause thereof in a summary manner, at the cost of the owner or occupant of the premises where the nuisance or cause thereof may be, and for that purpose may enter upon and take possession of any premises or property where such nuisance may exist or be produced.

"Twelfth.  The assembly, through its officers or agents, may, at all reasonable times, enter into and examine all dwellings, lots, yards, enclosures and buildings of every description, to ascertain their condition for health, cleanliness and safety; take down and remove buildings, walls or superstructures, that are or may become dangerous, or require owners to remove or put them in a safe and secure condition, at their own expense. . . .

"Fourteenth.  Finally, to pass all such ordinances, not inconsistent with the provisions of this charter, or the laws of the State, as may be expedient, in maintaining the peace, good government, health and welfare of the city, its trade, commerce and manufactures, and to enforce the same by fines and penalties not exceeding five hundred dollars, and by forfeitures not exceeding

one thousand dollars; to purchase, rent, or lease, within the limits of the city or elsewhere, any real or personal property, and to control, manage, sell, or lease, or otherwise dispose of the same for such purposes and considerations as they may deem proper for the public welfare of the city, and to provide for the enumeration of the inhabitants of the city.''

It is earnestly contended and very ably argued that subdivision 5 of section 26, article 3, quoted herein, providing for the licensing, taxing and regulating the business of real estate agents, supports the power exercised by the legislative assembly of the city, in the enactment of the ordinance assailed in this cause.

We must decline to give our consent to this contention. In view of the express grant of power contained in subdivision 12 of section 26, article 3, covering the subject-matter of repairing and removing dangerous buildings, the power sought to be exercised by the ordinance before us was never intended to be granted by the provision for the mere regulation of the business of real estate agents.

Terms could not be used in a charter which are more positive and direct than those used relating to this subject, in subdivision 12, supra. It says, ''Take down and remove buildings, walls or superstructures, that are or may become dangerous, or require owners to remove or put them in a safe and secure condition, at their own expense.''

That the Municipal Assembly, in the enactment of the ordinance in question, predicated its power to enact such legislation upon subdivision 12 is too plain for discussion. The very terms of the ordinance clearly indicate an effort to exercise the powers granted in the last subdivision mentioned. Note the similarity of the terms used. The charter says, ''Remove or put them in a safe and secure condition.'' The ordinance says, ''Remove or otherwise properly secure.''

Subdivision 12 of the charter is a full and compre-

hensive provision; it provides the authority for examination of buildings to ascertain their condition for health, cleanliness and safety, and then makes the sweeping grant of power, in case of dangerous buildings, to either require the owner to remove or put it in safe condition.

If this is not to be classified as an express grant of power over a subject-matter, we are unable to conceive the employment of terms in a charter which would be so regarded.

Even though it be conceded that the express grant of power as contained in subdivision 12 would not prohibit the exercise of the power under a general clause, yet such exercise of power can not abrogate the limitations contained in the express grant. Hence, at last, we are relegated, as to the extent of power which can be legally exercised, to the express grant on the particular subject-matter to which the legislation is to be made applicable.

DILLON, in his recognized work on Municipal Corporations, very clearly announces the rule. In treating of this subject, he says:

"Municipal charters, or incorporating acts, are sometimes silent as to the power to pass by-laws or ordinances; and where this is the case, the municipal body has the power, incidental to all corporations, to enact appropriate by-laws. Occasionally, the charter or incorporating act, without any special enumeration of the purposes for which by-laws may be made, contains a general and comprehensive grant of power to pass all such as may seem necessary to the well-being and good order of the place. More frequently, however, the charter or incorporating act authorizes the enactment of by-laws in certain specified cases, and for certain purposes; and after this specific enumeration a general provision is added, that the corporation may make any other by-laws or regulations necessary to its welfare, good order, etc., not inconsistent with the Con-

stitution or laws of the State. This difference is essential to be observed, for the power which the corporation would possess under what may, for convenience, be termed 'the general welfare clause,' if it stood alone, may be limited, qualified, or, when such intent is manifest, impliedly taken away by provisions specifying the particular purposes for which by-laws may be made. It is clear that the general clause can confer no authority to abrogate the limitations contained in special provisions. When there are both special and general provisions, the power to pass by-laws under the special or express grant can only be exercised in the cases and to the extent, as respects those matters, allowed by the charter or incorporating act; and the power to pass by-laws under the general clause does not enlarge or annul the power conferred by the special provisions in relation to their various subject-matters." [1 Dill., Mun. Corp. (4 Ed.), pp. 392, 393.]

This court in Ruschenberg v. Railroad, 161 Mo. 70, in treating of special and general provisions contained in an act or charter, through GANTT, J., said:

"When there are two acts or *charter provisions* or ordinances, one of which is special and particular and certainly includes the matter in question, and the other general, and such that, if standing alone, it would include the same matter and thus conflict with the special act, the special act must be taken as intended to constitute an exception to the general act, and especially is this the law, when such general and special acts are contemporaneous."

The authority to exercise the power contemplated by the ordinance in the case at bar, that is, to compel the agent, at his own expense, either to remove the building of his principal, which is ascertained to be dangerous, or put it in a safe and secure condition, or submit to the penalties imposed by the act, must either fall or stand on the power granted in the charter by subdivision 12, supra.

Unless the terms of subdivision 12, which provides that *owners* may be required to remove or repair damaged buildings, can be extended and made applicable to the agents of such owners, the enactment of the ordinance, so far as it is made applicable to the agent, is without authority and void. We can not look to subdivisions 6 and 14, supra, for the power of extension to agents, for the reason that there is an express grant of power as to the particular subject-matter—that of removing or putting in safe and secure condition, dangerous buildings, and even though it be conceded that the general provision of subdivisions 6 and 14 of the charter authorizes the exercise of power as to the same subject-matter, yet under the well-settled rules of interpretation, the limitations of the power, as fixed by the express grant, can not be abrogated by the general provisions. So it makes no difference upon which provision of the charter this ordinance is predicated, whether subdivision 6, 14 or 12, unless the terms *owners* can be made to apply to agents, it has no power upon which it can rest.

The purpose of the provision of the charter, in respect to the removal and repair of dangerous buildings, doubtless was to avoid any injury to the citizen, which might result from such conditions.

The limitations of the exercise of the power over this subject, to the owners of the property, is a reasonable one, and is sufficient to accomplish fully the purposes sought by the charter provisions. And we are unwilling to give our sanction to this ordinance, which undertakes to impose a penalty upon those who have no substantial interests in the property, and to compel them, at their own expense, to remove the dangerous buildings of their principal, for the benefit of the city, without any remedy for any loss they may sustain, when the city has full and ample power to accomplish the same result, with an adequate remedy for the recovery of the cost of such work, against the only party who,

upon principles of common fairness and justice, should be made to pay it—that is, the owner.

While it may be convenient, in the exercise of the power granted by the provisions of the charter, to extend the application of the term *"owners"* to *agents* of the owners, it is not a reasonably necessary incident to the express power granted, which confines it to the owners.

The rule is, that it must not only be "reasonably incident to the express powers granted or convenient for the exercise of such power," but it must be essential and indispensable to the purposes to be accomplished by the corporation.

It is argued that the city would be helpless over this subject, unless this ordinance can be enforced. It is said that the owner may be a non-resident, and can not be reached. His property can be reached, and there is full authority for reaching it. It is also urged that the agent should suffer this penalty, for the reason that he could have surrendered the property whenever it was ascertained to be unsafe or dangerous; that may be true, but if the agent surrenders the property, it certainly lessens the force of the contention that the city would be helpless, without an agent upon whom to operate. The charter provisions fully meet this condition; the city has a full and complete remedy in either case— agent or no agent. The only difference is that if this ordinance can be maintained, the city can.compel the agent, who may have charge of the property, to do for it, at his own expense, that which, in the absence of any agent, it would be required to do for itself, at the expense of the owner of the property.

If buildings are unsafe or dangerous, the city has full power to remove them or put them in a safe or secure condition, and make the owners of the property pay for them. This sufficiently answers the complaint that the respondent would be without remedy.

In the exercise of the powers granted by the char-

ter, it might very strongly be urged that the city could, by ordinance, in the regulation of the business of real estate agents, prohibit them from handling or renting dangerous or unsafe buildings, and for the non-observance of such ordinance, impose penalties; or a plausible argument could be based upon the support of an ordinance, which provides for their refusal to longer rent the premises, after due notice of its unsafety; but that is not this case and it is unnecessary to express an opinion upon the supposed ordinance.

Here we have real estate agents, with full legal power to contract with the owners of property, to manage and rent it for them, and should the property become dangerous or unsafe, they are compelled to remove it or put it in safe and secure condition at their own expense, regardless of the contractual relations existing between them and their principal. This can not be done.

The conclusion reached, that this power can not be exercised under the provision of the charter for regulating the business of real estate agents, is fully supported in City v. Bell Telephone Co., 96 Mo. 623. It was ruled, substantially, in that case that while a provision of the charter standing alone might authorize the exercise of certain powers, yet if the subject-matter was fully covered by an express grant of power, upon the subject-matter involved, it would justify the implication that such power was not intended to be vested by the provision which did not contain such express grant. We repeat that this far-reaching ordinance can not be supported by the provision which simply undertakes to regulate the business of real estate agents.

The cases to which our attention has been directed are not in conflict with the conclusion reached in this cause.

In the interpretation of charter provisions granting the exercise of powers to municipal corporations,

courts should always keep in view that well-recognized rule of construction, so clearly and aptly stated by Judge DILLON, where he says:

"It is a general and undisputed proposition of law that *a municipal corporation possesses and can exercise the following powers, and no others*: (1) Those granted in *express words;* (2) those *necessarily or fairly implied* in or *incident* to the powers expressly granted; (3) those *essential* to the declared objects and purposes of the corporation—not simply convenient, but indispensable. Any fair, reasonable doubt concerning the existence of power is resolved by the courts against the corporation, and the power is denied." [Vol. 1 (4 Ed.), p. 145.]

With the application of this crucial test to the provisions of the charter, upon which is predicated the power sought to be exercised by the ordinance in judgment before us, we have reached the conclusion that this ordinance, so far as applicable to the agents of the property owners, is without authority, also unreasonable and oppressive and can not be enforced.

The judgment in this cause is reversed and the defendant discharged.

All concur.